IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

CARLA SUE CHESTNUT,                  )
             Plaintiff,                  )
                            )
    v.                  )      Civil Action No. 4:13-cv-00008
                            )
CAROLYN W. COLVIN,[1]                  )
Acting Commissioner                  )
Social Security Administration,                  )    By:    Joel C. Hoppe
             Defendant.                  )    United States Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Carla Sue Chestnut ("Chestnut") asks this Court to review the Commissioner of Social Security's ("Commissioner") decision denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. Chestnut primarily argues that she does not have the residual functional capacity to perform sedentary work involving simple instructions and simple, routine tasks. Alternatively, Chestnut argues that she cannot work as an addresser or call-out operator because those jobs involve more than "simple" instructions. Chestnut asks the Court to reverse the Commissioner's decision and award her benefits without remanding her case for further consideration.

This Court has authority to decide Chestnut's case under 42 U.S.C. §§ 405(g), 1383(c)(3), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B). (*See* ECF No. 19.) After carefully reviewing the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that substantial evidence supports the Administrative Law Judge's

---

[1] Colvin became Acting Commissioner of the Social Security Administration on February 14, 2013. Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the defendant in this suit. *See* Fed. R. Civ. P. 25(d).

("ALJ") decision that Chestnut can perform the representative occupation of addresser. Therefore, I **RECOMMEND** that this Court **DENY** Chestnut's Motion for Summary Judgment (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 17), and **DISMISS** this case from the Court's active docket.

## I. Procedural History

Chestnut protectively filed this DIB/SSI application on June 30, 2009. (R. 212.) At the time, she was a 37-year-old college graduate with a certificate in business management. (*See* R. 53.) Chestnut claimed that "Grand mal epileptic seizures, post-dramatic [*sic*] stress disorder/anxiety attacks[,] diabetes," and a back injury kept her from working since November 11, 2008. (R. 226.) She did not allege, however, that those impairments forced her to stop working on that date. Instead, Chestnut reported that she had been unable to find gainful employment since being laid off for "other reasons." (*Id.*)

A state agency twice denied Chestnut's application in 2010. (*See* R. 118, 122, 131, 133.) On June 22, 2011, Chestnut appeared at an administrative hearing with counsel and Holly Mackey, a close friend who testified on Chestnut's behalf. (R. 49, 51.) A Vocational Expert ("VE") also testified at the hearing as to the type of jobs that Chestnut might perform given her age, education, work history, and physical and mental limitations. (*See* R. 84–100.) In a written opinion dated July 22, 2011, the ALJ found that Chestnut was not disabled. (R. 24.) He denied Chestnut's application at Step Five. (*See generally* R. 24–38.)

At Step One, the ALJ found that Chestnut had not engaged in substantial gainful activity since November 11, 2008. (R. 24.) At Step Two, he found that Chestnut suffered from severe insulin-dependent diabetes mellitus, post-traumatic stress disorder, affective disorder, and obesity. (R. 25.) The ALJ also found that Chestnut's back pain and seizure disorder were "non-

severe" impairments because they did not significantly interfere with her ability to perform basic work activities. (*See id*.)

At Step Three, the ALJ concluded that Chestnut did not have a severe impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 27.) His analysis at this step focused exclusively on Chestnut's mental impairments.[2] (*See* R. 27–29.) The ALJ concluded that Chestnut's affective disorder and post-traumatic stress disorder did not meet or medically equal the criteria in Listings 12.04 or 12.06. (*See* R. 28–29.)

Before reaching Step Four, the ALJ determined that Chestnut had the residual functional capacity ("RFC")[3] to understand, remember, and carry out simple instructions and to perform unskilled sedentary work involving simple, routine tasks. (R. 29.) He also limited Chestnut to jobs where she could avoid hazards such as machinery and heights. (*Id*.) In making this determination, the ALJ considered the extent to which Chestnut's impairments and symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence" in her record. (*Id*.) He also considered statements from Chestnut and Mackey, and medical opinions from treating sources, consultative sources, and state-agency sources. (*See generally* R. 29–36.)

At Step Four, the ALJ determined that Chestnut could not perform her past relevant work as a telephone solicitor, customer-service representative, directory-assistance operator, food-

---

[2]  Chestnut does not challenge the ALJ's failure to evaluate her severe diabetes under the listings for other body systems. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 9.00(b)(5) (Jun. 7, 2011).

[3]  "RFC" is an applicant's maximum "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" despite his or her limitations. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. §§ 404.1545(a), 416.945(a), and reflects the "total limiting effects" of the person's impairments, *id*. §§ 404.1545(e), 416.945(e).

service worker/hospital dietary aide, or receptionist. (R. 36.) He agreed with the VE's testimony that Chestnut's impairments kept her from performing these semi-skilled and skilled jobs. (*See* R. 36, 38, 85–86.)

At Step Five, the ALJ determined that Chestnut could still perform certain "sedentary and unskilled/SVP 2 occupations,"[4] including addresser and call-out operator. (R. 37.) The VE mentioned those occupations in response to the ALJ's question about jobs a person matching Chestnut's age, education, and work experience might transition to if she: (1) could perform sedentary work involving simple, routine tasks; (2) could understand, remember, and carry out simple instructions; (3) should have only occasional interaction with others; and (4) should avoid exposure to hazards such as machinery and heights. (*See* R. 88.) The ALJ found the VE's testimony consistent with the *Dictionary of Occupational Titles* ("*DOT*"), and that both jobs existed in significant numbers in the national economy. (R. 38.) Thus, he found Chestnut was "not disabled" under the Act and agency regulations. (*Id.*) The Appeals Council declined to review the ALJ's decision on January 24, 2013 (R. 1), and this appeal followed.

## II. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final determination that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations,

---

[4] " 'Unskilled' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.' " *Fisher v. Barnhart*, 181 Fed. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). "SVP" stands for "Specific Vocational Preparation." An SVP level describes the time typically required to "learn the techniques, acquire the information, and develop the facility needed for average" job performance. Dep't of Labor, Office of Admin. Law Judges, *Dictionary of Occupational Titles* app. C ¶ II (4th ed. 1991). "Unskilled work corresponds to an SVP of 1–2." Soc. Sec. Ruling 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if " 'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.' " *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an

impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## III. Discussion

Chestnut primarily objects to the ALJ's conclusion that she can perform sedentary work involving simple instructions and simple, routine tasks. (Pl. Br. 1.) She argues that the ALJ should have given "greater weight" to Dr. Henry Comiter's opinion of her seizure disorder's limiting effects, and that the ALJ's reasons for giving that opinion "little weight" were "insufficient and not supported by substantial evidence." (Pl. Br. 24.) Chestnut also argues that the ALJ "improperly evaluated" her credibility. (Pl. Br. 27.) Here Chestnut claims that her medical records corroborate her testimony about her impairments and inability to work. (*Id.*)

Alternatively, Chestnut objects to the ALJ's conclusion that a person who can carry out only "simple instructions" could still work as an addresser or call-out operator. (*See* Pl. Br. 1–2.) She claims that the ALJ should not have relied on the VE's testimony to that effect because it conflicted with the ALJ's hypothetical and with the Reasoning Development Levels assigned to those jobs in the *DOT*. (*See* Pl. Br. 23.) Assuming there was a conflict, Chestnut also argues that the ALJ committed legal error when he did not reconcile the VE's testimony with the *DOT*. (Pl. Br. 24.)

*A. Chestnut's Treating Physician*

Agency regulations instruct ALJs to weigh each medical opinion[5] in the applicant's record. 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions from treating physicians receive either "controlling weight" or less than controlling weight. *Id.* §§ 404.1527(c), 416.927(c). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the applicant's] case record." *Id.*; *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").

The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). He also must consider certain factors in determining what weight to give that opinion, such as the length and nature of the doctor-patient relationship, the weight of the evidence supporting the opinion, the physician's medical specialty, and the opinion's consistency with other evidence in the record. *See id.*; *Clausen v. Astrue*, No. 5:13-cv-23, 2014 WL 901208, at *9 (W.D. Va. Mar. 7, 2014). That obligation is satisfied when the ALJ's decision "indicates" that he considered the required factors. *Burch v. Apfel*, 9 Fed. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11-cv-29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 1569564 (May 3, 2012) (Kiser, J.).

---

[5] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Medical opinions are distinct from medical-source opinions on dispositive issues reserved to the Commissioner. *See id.*

*i. Evidence of Chestnut's Seizure Disorder*

Chestnut reports a history of petit mal seizures since age 12. (*See* R. 669, 673, 789.) Her seizures were well controlled with and without medication for seven years until November 8, 2006. (*See* R. 692, 713, 763.) On November 9, 2006, Dr. Michael Gebel evaluated Chestnut for "a possible seizure disorder" after she reportedly experienced a grand mal seizure brought on by a motor vehicle accident. (R. 669.) Dr. Gebel restarted Chestnut on prescription Topamax, which had controlled her seizures for several years before the accident. (*See* R. 669–70.)

In April 2007, Chestnut initiated a treatment relationship with doctors at the Epilepsy Association of Central Florida. (*See* R. 763.) At the time, she had been off Topamax for two months and recently experienced her first seizure since November 2006. (*See id.*) On April 25, 2007, Dr. John Shewmaker refilled Chestnut's Topamax and instructed her to follow up with his colleague Dr. Henry Comiter. (R. 764.)

Chestnut first saw Dr. Comiter on May 19, 2008. (R. 762.) Dr. Comiter's notes from that visit mostly recount Chestnut's treatment history with Drs. Gebel and Shewmaker. (*See id.*) He noted that Chestnut saw Dr. Gebel for "staring/lipsmacking" in August 2007, but that she had not experienced a grand mal seizure since Dr. Shewmaker restarted her on Topamax in April 2007. (*Id.*) Chestnut apparently did not see a neurologist again until April 2009, five months after the onset date of her allegedly debilitating grand mal seizures. (*See* R. 738, 226.) As of April 14, 2009, Chestnut had been "seizure-free on Topamax" for two years. (R. 738.)

Chestnut returned to Dr. Comiter's office on June 29, 2009. (R. 761.) At that visit she reported two seizures in the past year, both in May 2009. (*Id.*) Chestnut also reported that she experienced headaches, eye discomfort, and difficulty speaking or understanding speech after those seizures. (*Id.*) At her next visit with Dr. Comiter on December 21, 2009, Chestnut reported

having one seizure in September 2009.[6] (*See* R. 791.) She also complained of "always present" headaches, which Dr. Comiter suspected were related more to her eyesight than to her epilepsy. (*See id.*) Dr. Comiter started Chestnut on prescription Lamictal and instructed her to return to his office in six months. (*Id.*)

On February 5, 2010, Chestnut reported to Nurse Janine Kyte that she experienced a seizure and headache earlier in the week. (R. 845.) On March 23, 2010, Nurse Kyte cleared Chestnut to participate in an exercise program to prepare for a planned overseas mission trip.[7] (R. 870-71.) Chestnut did not report any seizure activity between February 5 and March 23, 2010.

On July 8, 2010, Chestnut went to a Tennessee emergency room complaining of "headaches and seizure" brought on by hitting her head on a waterslide several days earlier. (R. 990.) She told the attending physician that her last seizure was "6 months ago." (R. 993.) A nurse and physician observed that Chestnut was awake, alert, and oriented; her strength was intact; her speech was coherent and normal; and her mood and affect were normal. (R. 990–92, 996.) She was discharged in "satisfactory" condition , instructed to follow up with her regular healthcare providers, and told to "make sure" they knew that she had another seizure in case her medications needed to be adjusted. (R. 996, 1000.)

---

[6] At a December 2009 consultative visit with psychologist Dr. Katherine Muir, Chestnut reported having one seizure "while crossing a street" in October 2009. (R. 789.) The ALJ suspected that Chestnut experienced one seizure in "September or October 2009." (*See* R. 27.) Chestnut also apparently counted this seizure among the seven "spells" she experienced between December 2009 and March 2011. (*See* R. 941.)

[7] Two months earlier, Nurse Kyte had refused to declare Chestnut "fit for mission work until her . . . seizures [were] in better control and she could be more physically active." (R. 860.) The nurse did not say why she thought Chestnut needed "better" seizure control. (*See id.*) At that January 2010 visit, Chestnut reported that she "continue[d] to work with neurology on [her] seizure disorder" and recently added Lamictal to her treatment. (R. 858.) Chestnut did not report any seizure activity since her last visit with Nurse Kyte in July 2009.

Chestnut next saw Nurse Kyte for a routine visit on October 4, 2010. She reported experiencing "headaches every day" since suffering a concussion in July 2010, but she did not report any seizure activity. (R. 957.) Chestnut also told Nurse Kyte that she was now walking two miles every day and "doing very well." (R. 956.)

Chestnut saw Dr. Comiter again on March 7, 2011. (*See* R. 941.) She confirmed that she was still taking Topamax and Lamictal, and that she experienced "no side-effects" on these medications. (*Id.*) Chestnut told Dr. Comiter that she had experienced seven "spells" in the 15 months since she last saw him in December 2009. (*Id.*) One was reportedly a grand mal seizure, while the others involved amnesia but no loss-of-consciousness. (*See id.*) Chestnut also said that she experienced headaches and confusion "often for many days" after these spells. (*Id.*) She reported an unidentified "spell" on the morning of March 7, and Dr. Comiter observed that Chestnut appeared "confused" later that day. (*Id.*)

*ii. Dr. Comiter's Opinion*

On March 7, 2011, Dr. Comiter completed a "Seizures Medical Source Statement" in which he opined on the nature and limiting effects of Chestnut's seizure disorder. (*See* R. 942–45.) For example, Dr. Comiter estimated that Chestnut had six seizures per year. (R. 942.) He noted that she experienced both grand mal and petit mal seizures, and that a "typical seizure" involved "loss-of-consciousness or amnesic spell, followed by headache/confusion." (*Id.*) Dr. Comiter also wrote that Chestnut's postictal confusion, irritability, and headaches "can last for days," and that she "cannot function well" in her daily activities after a seizure. (R. 943.) He believed Chestnut could perform full-time low-stress work, but that her disorder would cause her to miss "more than four" workdays each month. (*See* R. 945.) Dr. Comiter declined to "describe

any other limitations . . . that would affect [his] patient's ability to work at a regular job on a sustained basis." (*Id.*)

The ALJ considered Dr. Comiter's opinion at Step Two. (R. 27.) He gave that opinion "little weight" because he found it "inconsistent" with other substantial evidence in the record. (*Id.*) After carefully reviewing Chestnut's medical records, the ALJ counted "seven seizures in the span of about 4 and one-half years"—far fewer than Dr. Comiter's estimated six seizures each year. (*Id.*) The ALJ also found Dr. Comiter's opinion that Chestnut "cannot function well" after a seizure inconsistent with Chestnut's many daily activities and pre-travel exercise regime. (*Id.*) Accordingly, he concluded that Chestnut's seizure disorder did not significantly limit her ability to do basic work activities. (*See* R. 25, 27.) The ALJ later factored Chestnut's seizure disorder into his RFC determination. (*See* R. 27, 29, 31.)

Chestnut argues the ALJ overlooked the possibility that "not every seizure is documented by a trip to the emergency room to the doctor" because she does not seek treatment after each seizure. (Pl. Br. 27.) While that may be true, it is reasonable to expect that Chestnut would accurately report her seizure activity to her healthcare providers. (*See, e.g.*, R. 761, 791, 941, 990, 1000.) Indeed, the treatment note form used by the Epilepsy Association of Central Florida has an entry that asks for the dates of any seizures since the patient's last office visit. (*See* R. 761, 791, 941.) Chestnut's medical records document six self-reported seizures during the three-year period of alleged disability: two in May 2009 (R. 761); one in September or October 2009 (R. 791, 789); one in February 2010 (R. 845); one in July 2010 (R. 990); and one in March 2011 (R. 941). Those records adequately support the ALJ's conclusion that Dr. Comiter's estimate of

six seizures per year was inconsistent with other substantial medical evidence in Chestnut's record.[8] *See Craig*, 76 F.3d at 590.

Chestnut also argues that the ALJ ignored other evidence establishing the severity of her postictal symptoms. (*See* Pl. Br. 26–27.) She cites three medical records that she believes "confirm" Dr. Comiter's opinion that headaches, confusion, and irritability essentially disable Chestnut for days after a seizure (*See id.* (citing R. 990, 943, 941).)

The first record is from the July 2010 emergency-room visit where Chestnut reported experiencing a seizure after she hit her head on a waterslide. (*See* R. 990.) Chestnut complained of postictal headache, but not confusion or irritability. (*See id.*) The physician observed that Chestnut's mood and affect were normal at that visit and discharged her in satisfactory condition. (R. 990–92.) Far from confirming Dr. Comiter's opinion or Chestnut's report of the disabling effects of a seizure, the physician's examination that was performed contemporaneously to Chestnut's reported seizure revealed normal functioning. Additionally, Chestnut's discharge papers instructed her to "return to the emergency department immediately" if she experienced "persistent confusion." (R. 1000.) According to her records, Chestnut did not seek any further medical treatment until October 2010. (*See* R. 957.)

The second record is a page from the "Seizures Medical Source Statement" that Dr. Comiter completed on March 7, 2011. (*See* R. 943.) Dr. Comiter checked boxes on that form indicating that Chestnut suffers postictal confusion, irritability, and headaches which "can last

---

[8] Later in his opinion, the ALJ incorrectly states that Chestnut "testified she has grand mal and petit mal seizures about 2 times every 6 months." (R. 29.) In fact, Chestnut said she has "maybe two" grand mal seizures "every six months" (R. 62) and "kind of like one" petit mal seizure "every two or three months" (R. 64). But in March 2011, Chestnut told Dr. Comiter that she had *one* grand mal seizure in the 15 months between December 2009 and March 2011. (R. 941.) Although Chestnut reported six petit mal seizures in the same period, she apparently did not report *any* new seizure activity to healthcare providers in April and July 2009, or January, March, July, and October 2010. (*See* R. 738, 845, 835, 858, 990, 957.)

for days." (*Id.*) Describing "the degree to which having a seizure interferes with [his] patient's daily activities following a seizure," Dr. Comiter said simply that Chestnut "cannot function well." (*Id.*) This is the discredited opinion that Chestnut's believes deserved greater weight. However, it represents little more than a reiteration of Chestnut's subjective statements.

The third record is Dr. Comiter's March 7, 2011, treatment note transcribed the same day Chestnut reportedly experienced a "spell." (R. 941.) Dr. Comiter observed that Chestnut appeared "confused" during that visit. (*Id.*) Thus, this record supports Dr. Comiter's opinion that Chestnut suffers postical confusion. But it does not "confirm" his opinion that Chestnut "cannot function well" for "days" after a seizure. (R. 943.) That conclusory opinion seems simply to repackage Chestnut's report that she is "often" confused "for many days" after a seizure. (R. 941.) The ALJ certainly may give "significantly less weight" to a treating physician's "conclusory opinion based on the applicant's subjective reports." *Craig*, 76 F.3d at 590.

The ALJ also may discount a treating physician's conclusory opinion when it is inconsistent with the applicant's daily activities. *Dennison v. Astrue*, 5:10-cv-109, 2011 WL 2604847, at *2 (W.D. Va. Jul. 1, 2011) (citing *Craig*, 76 F.3d at 590). Here the ALJ found that Chestnut "got physically ready" for an overseas mission trip and performed many daily activities during the alleged period of disability. (R. 27; *see also* R. 35.) For example, Chestnut told Nurse Kyte in October 2010 that she was walking two miles every day to prepare for her mission trip. (*See* R. 957.) In June 2011, Chestnut and Mackey testified that Chestnut lives alone, feeds, grooms, and dresses herself, cleans her apartment, cares for a cat, leaves her apartment several times per day, goes shopping with friends, and attends church every Sunday. (*See* R. 35.)

Chestnut argues that the "ALJ ignored Ms. Mackey's corroborating testimony" about Chestnut's postical symptoms. (Pl. Br. 26–27.) Mackey testified that her friend is "very

confused" and "always has a headache" after a petit mal seizure. (R. 80.) "[I]n some instances, these headaches last just for a few days to several weeks," Mackey said. (*Id.*) But she did not say whether Chestnut's symptoms limit her daily activities. (*See id.*) At Step Two, the ALJ's main concern is whether an impairment "significantly limit[s]" the applicant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). Mackey's testimony did not speak to that question. Thus, substantial evidence supports the ALJ's conclusion that Dr. Comiter's opinion is inconsistent with Chestnut's daily activities. *See Craig*, 76 F.3d at 590.

I also find that substantial evidence supports the ALJ's decision to give Dr. Comiter's opinion "little weight." (R. 27.) Although the ALJ's analysis here is a bit thin, his decision indicates that he considered the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See Burch*, 9 Fed. App'x at 259; *Vaughn*, 2012 WL 1267996, at *5. First, the ALJ reviewed Dr. Comiter's treatment notes from his previous three visits with Chestnut. (*See* 26–27 (citing R. 761–62, 791, 941).) Those notes establish the length, frequency, nature, and extent their doctor-patient relationship. (R. 761–62, 791, 941.) *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). They also establish Dr. Comiter's specialty as a physician with the Epilepsy Association of Central Florida. *See id.* §§ 404.1527(c)(5), 416.927(c)(5).

Second, the ALJ specifically addressed whether Dr. Comiter's opinion was inconsistent with the substantial weight of the other evidence in Chestnut's record. (*See* R. 26–27.) *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). As already discussed, relevant medical records and testimony contain "persuasive contradictory evidence" that Chestnut's seizures disorder is not as debilitating as Dr. Comiter's opinion suggests. *Craig*, 76 F.3d at 590.

The ALJ did not say whether Dr. Comiter explained or presented any relevant evidence to support his opinion. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Those considerations

only hurt Chestnut's case for deference, though. For example, Dr. Comiter opined that Chestnut would miss more than four workdays *each* month, even though she experiences one seizure every *two* months. (R. 942, 944.) He did not explain how he came up with the former figure, and his treatment notes contain no evidence or medical findings that might support his opinion. (*See id.*) These are all "good reasons" for the ALJ to discount Dr. Comiter's opinion. *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

*B. Chestnut's Credibility*

Chestnut also argues that the ALJ improperly evaluated her impairments and credibility. (Pl. Br. 27.) It is not this Court's role to determine whether Chestnut was a credible witness. *See Craig*, 76 F.3d at 589; *see also Shively v. Heckler*, 739 F.3d 987, 989 (4th Cir. 1984). Rather, the Court must be satisfied that the ALJ applied the proper legal standard in evaluating Chestnut's credibility, and that substantial evidence supports his finding that Chestnut's testimony was "not fully credible." (R. 35.) *See Craig*, 76 F. 3d at 589.

ALJs follow a two-step process for evaluating an applicant's statements about her symptoms. *See* 20 C.F.R §§ 404.1529, 416.929; Soc. Sec. Ruling 96-7p, 1996 WL 374186 (Jul. 2, 1996). First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the applicant's alleged symptoms. Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2. If there is, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which [they] limit [her] ability to do basic work activities." *Id.* Whenever the applicant's symptoms are "not substantiated by objective medical evidence," the ALJ "must make a finding on the credibility of the individual's statements" in light of the entire record. *Id.*

He must give specific reasons for the weight given to the applicant's statements, *id.*, and those reasons must be supported by substantial evidence in the record, *see Craig*, 76 F.3d at 589.

### i. Chestnut's Impairments and Symptoms

The ALJ started his step-one analysis by summarizing all of Chestnut's impairments and symptoms. (*See* R. 29–31.) For example, Chestnut testified that her seizures involve "head shaking, tongue biting, facial and spinal-column numbness, and confusion." (R. 29; *see also* R. 62–64.) After a seizure, Chestnut said she "is exhausted, confused, and has headaches lasting anywhere from 2 days to 2 weeks." (R. 29; *see also* R. 62–63.) Mackey also testified that Chestnut "is very confused, gets headaches, and has pain in her eyes" after a seizure. (R. 31; *see also* R. 80.)

Chestnut also testified that uncontrolled diabetes causes burning, swelling, pain, and numbness in her lower extremities. (*See* R. 30; *see also* R. 70.) She attributed most of her back problems to a tailbone injury in 2008, and reported that she still has pain radiating down her left leg. (R. 30.) Chestnut said both impairments interfere with her ability to dress, to use the bathroom, to climb stairs, and to walk for more than 10 minutes without resting. (R. 30; *see also* R. 70–72.)

Finally, Chestnut testified that she developed PTSD after her father pointed a gun at her in November 2007. (R. 30, 64.) She said she is "jumpy around loud noises," has nightmares, experiences anxiety attacks in crowded places, and feels as though people are watching her through her home's doors and windows. (R. 30, 64.) Mackey also testified that Chestnut "used to be outgoing but now keeps to herself, does not make eye contact, and has difficulty remembering things." (R. 31, 80–81, 83.)

*ii. The ALJ's Credibility Determination*

The ALJ found Chestnut's "testimony and subjective statements regarding her pain and limitations credible to the extent of establishing that she has severe impairments that are significantly limiting, but not fully credible to the extent of establishing that the impairments are so severe as to preclude her from performing substantial gainful activity." (R. 35.) In particular, the ALJ thought Chestnut's preparation for an overseas mission trip and other daily activities "tend[ed] to suggest that her alleged symptoms and limitations may have been overstated." (R. 35.)

At oral argument, Chestnut criticized the ALJ for conflating Chestnut's *desire* to perform overseas missionary work with her *ability* to perform that work. (*See also* Pl. Br. 31.) However, the ALJ considered Chestnut's increased physical activity in preparation for her mission trip, rather than just her desire. (*See* R. 35.) Chestnut first asked Nurse Kyte to clear her for the trip in January 2010. (*See* 860.) At that time, Nurse Kyte told Chestnut that she would not sign a form "saying she is fit for mission work until her diabetes and seizures are in better control and she could be more physically active." (R. 860.) Nurse Kyte did not say why she thought Chestnut needed "better" seizure control. She seemed most concerned with Chestnut's inability to walk the required "3–4 miles per day," since she had trouble walking down the hall during the January visit. (R. 860.) The nurse also observed Chestnut's judgment and insight were "questionable" at that time. (*Id.*)

Chestnut apparently took Nurse Kyte's concern to heart. By February 2010, she had "increased her physical activity" and was "walking a mile or more per day" to prepare for her trip. (R. 845.) She reported one recent seizure, and Nurse Kyte observed that Chestnut's judgment and insight remained "questionable." (R. 845, 848.) Still, the nurse commended

Chestnut for exercising more and instructed her to follow up in March to get "clearance for mission work." (R. 849.)

Nurse Kyte administered Chestnut's travel vaccines and cleared her to "undergo exercise testing and/or participate in [an] exercise program" on March 23, 2010. (R. 836.) Chestnut's judgment and insight were "intact [and] improved" at that visit, and she did not report any recent seizure activity. (*Id.*) By October 2010, Chestnut was enrolled in a mission school and reportedly walking two miles every day. (R. 956.) She also denied back pain, stiffness, and joint swelling, just as she had in March 2010. (R. 956, 836.) These records adequately support the ALJ's conclusion that Chestnut's "alleged symptoms and limitations may have been overstated." (R. 35.)

Chestnut's other objection is that the ALJ relied on a misinterpreted treating-source opinion to discredit her testimony regarding her mental limitations. (*See* Pl. Br. 28–29; R. 35–36.) The opinion was from Dr. Cheryl Laird, Chestnut's psychologist between March–July 2008, and December 2009–February 2010. (*See* R. 35–36.) In July 2008, Dr. Laird opined that Chestnut "displayed no limitations" in understanding, memory, concentration, persistence, social interaction, or adaptation. (R. 716–17.) Dr. Laird said Chestnut's mood was "blunted," but she did not think that would prevent Chestnut from working a regular full-time job. Indeed, Chestnut worked full-time until she was laid off for "other reasons" on November 11, 2008 (R. 226.)

In April and May 2010, Dr. Laird wrote identical letters giving her opinion that Chestnut "appeared able to deal with her issues" when she left counseling in July 2008. (R. 898, 899.) Dr. Laird said in the same letters that Chestnut's "memory had deteriorated" by the time she returned to counseling in December 2009. (*Id.*) She also reported that Chestnut "maintained detailed notes re: therapy and her daily activities/appointments due to the exaggerated memory loss." (*Id.*) It is

not clear whether these are Dr. Laird's own observations, or whether she is simply repeating Chestnut's subjective reports. Dr. Laird did not say whether she thought Chestnut could work in 2009–2010. (*See id.*)

Summarizing Dr. Laird's treatment notes, the ALJ wrote that Dr. Laird "noted in April 2010 that the claimant appeared to be able to deal with her issues," and that Chestnut "displayed no limitations" in understanding, memory, sustained concentration, persistence, social interaction, and adaptation. (R. 35–36.) Apparently, the ALJ thought Dr. Laird was describing Chestnut's mental state as it existed in April 2010. (*See* R. 35.) That is clearly wrong. The April and May 2010 letters say Chestnut could "deal with her issues" in July 2008. (R. 898, 899.) Dr. Laird documented some mental decline in late 2009, but she did not offer an opinion on Chestnut's ability to work at that time.

Despite the ALJ's erroneous reading of Dr. Laird's April 2010 letter, he did not doubt that Chestnut's mental impairments would cause "some limitations" in the workplace. (R. 36.) He accommodated those limitations in his determination of Chestnut's RFC by restricting her to "unskilled" jobs that involved "simple, routine tasks" and "simple instructions." (R. 29, 38.) The ALJ's reliance on Dr. Laird's opinion, while misplaced, was harmless.

The ALJ carefully reviewed Chestnut's longitudinal medical records (R. 31–35), compared Chestnut's testimony to her treatment history and daily activities (R. 30–31, 35), considered Mackey's supporting role in Chestnut's daily activities (R. 30–31), discussed Chestnut's relatively unremarkable physical and neurological exams (R. 31–34), and weighed medical-source opinions on Chestnut's impairments and functional limitations (R. 35–36). Considering the record as a whole, I find that substantial evidence supports the ALJ's determination that Chestnut's testimony was not fully credible.

*C. Chestnut's Ability to Perform Other Work*

Chestnut argues in the alternative that an RFC limiting her to "simple instructions" means that she cannot perform any job with a reasoning level of two or higher, as those levels are defined in the *Dictionary of Occupational Titles*. (*See* Pl. Br. 24.) Each job listed in the *DOT* is assigned a Reasoning Development ("RD") level that describes a "satisfactory" worker's ability to carry out instructions and to cope with departures from "standardized situations." *See* Dep't of Labor, Office of Admin. Law Judges, *Dictionary of Occupational Titles* app. C, ¶ III (4th ed. 1991), 1991 WL 688702. The levels range from Level 1: "Apply commonsense understanding to carry out simple one- or two- step instructions[; d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job," to Level 6: "Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems[; d]eal with a variety of abstract and concrete variables." *Id.* RD levels are distinct from SVP levels, which describe the time typically required to "learn the techniques, acquire the information, and develop the facility needed for average" job performance. *Id.* ¶ II. Unlike SVP levels, there is no indication that RD levels are mutually exclusive or cannot overlap. *See id.* ¶ ¶ II–III.

The ALJ's narrowest hypothetical in this case asked the VE to assume an individual matching Chestnut's age, education, and work experience who: (1) could perform sedentary work involving simple, routine tasks; (2) could understand, remember, and carry out simple instructions; (3) could only occasionally interact with people; and (4) should avoid exposure to hazards such as machinery and heights. (R. 88.) The VE testified that such a person could work

as an addresser or call-out operator. (*Id.*) Addresser[9] is classified at RD Level 2: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions[; d]eal with problems involving a few concrete variables in or from standardized situations. " *DOT* app. C, ¶ III. Call-out operator[10] is classified at RD Level 3: "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form[; d]eal with problems involving several concrete variables in or from standardized situations." *Id.*

On direct examination, the VE testified that there were "no conflicts between the occupational evidence [she] provided and the information contained in the *Dictionary of Occupational Titles.*" (R. 88–89.) On cross-examination, the VE also testified that a person who could handle only "simple instructions" could perform jobs with "a reasoning level of two or three," as those levels are defined in the *DOT*. (R. 94.) Chestnut's attorney did not contemporaneously object to the VE's testimony.[11]

On appeal, Chestnut argues that the "ALJ's hypothetical and ultimate residual functional capacity finding limited the individual to a reasoning [development] level of 1." (Pl. Br. 24.) The ALJ did not expressly so limit his hypothetical or RFC finding (*see* R. 88, 38), and Chestnut cites no authority from which that limitation might be implied (*see* Pl. Br. 24). In any event, this Court

---

[9] An "addresser" addresses items for mailing. *See DOT* No. 209.580-101. The VE testified that were 26,609 addresser jobs in the national economy as of June 2011. (R. 88.) Based on that testimony, the ALJ concluded Chestnut could transition to "work that exists in significant numbers in the national economy." (R. 38.)

[10] A "call-out operator" predominately compiles credit information to fulfill subscribers' requests via telephone. *See DOT* No. 237.367-014. The VE testified that there were 19,073 call-out operator jobs in the national economy as of June 2011. (R. 88.)

[11] Chestnut's attorney later submitted a letter arguing that the ALJ's hypothetical necessarily limited Chestnut to jobs at RD Level 1 because "jobs at the reasoning level of '2' or '3' . . . entail more complex abilities than could be performed by [someone] who is limited to simple instructions and simple, routine tasks." (R. 382.) She urged the ALJ to reject the VE's testimony to the extent that it "assume[d] ALL unskilled jobs are 'simple' jobs." (R. 383.) The ALJ implicitly rejected that argument when he concluded that the VE's testimony was "consistent with the information contained" in the *DOT*. (R. 38 (citing Soc. Sec. Ruling 00-4p).)

recently rejected a similar argument from an applicant who was limited to "short, simple instructions." *Snider v. Colvin*, No. 7:12-cv-00593, 2014 WL 793151, at *7 (W.D. Va. Feb. 26, 2014).

Like Chestnut, Snider argued it was error for the ALJ to conclude that she could be an addresser, which is classified at RD Level 2. *See id.* After reviewing the regulatory language and cases on point, this Court was persuaded "that a reasoning level of two is not inconsistent with tasks that involve following short, simple instructions." *Id.* at *6 (citing *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005); *Burnette v. Astrue*, No. 2:08-cv-9-FL, 2009 WL 863372, at *5 (E.D.N.C. Mar. 24, 2009) (collecting cases)).

I am also persuaded that Chestnut's RFC allows her to transition to a RD Level 2 job such as addresser. *See id.* The ALJ limited Chestnut to "unskilled" work involving "simple instructions" and "simple, routine tasks." (R. 29, 38.) Unskilled work requires the ability "to understand, carry out, and remember *simple* instructions; to respond *appropriately* to supervision, coworkers, and *usual* work situations; and to deal with changes in a *routine* work setting." Soc. Sec. Ruling 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985) (emphasis added); *see also* 20 C.F.R. § 416.968(a) ("Unskilled work is work [that] needs *little or no judgment* to do *simple duties* that can be learned on the job in a short period of time." (emphasis added)). I see no conflict between those requirements and the ability to "apply *commonsense* understanding to carry out detailed but *uninvolved* written or oral instructions" or to "[d]eal with problems involving *few* concrete variables in or from standardized situations." *DOT* app. C, ¶ III (emphasis added). Thus, I find substantial evidence supports the ALJ's decision that Chestnut can perform work that exits in significant numbers in the national economy. (*See* R. 38.)

That said, I am not convinced that Chestnut's RFC allows her to transition to a RD Level 3 job such as call-out operator. It may well be legal error to expect a worker who can only execute "*simple* instructions" to also "carry out *instructions* furnished in written, oral, or diagrammatic form." *Id.* (emphasis added). Neither the Fourth Circuit nor this Court has addressed that question, and our sister districts have produced conflicting answers. *E.g., compare Graham-Willis v. Colvin*, No. 1;12-cv-02489, 2013 WL 6840465, at *7 (D.S.C. Dec. 27, 2013) (remanding for the ALJ to resolve apparent conflict between "simple instructions" and RD Level 3 job), *with Clarkson v. Comm'r, Soc. Sec. Admin.*, Civil No. SAG-110631, 2013 WL 308854, at *2 (D. Md. Jan. 24, 2013) (finding no apparent conflict between "simple instructions" and RD Level 3 job). So I will save that question for another case in which the answer might change my recommendation. *See Cameron v. Astrue*, No. 7:10-cv-58, 2011 WL 2945817, at *3 (W.D. Va. Jul. 21, 2011) ("Procedural perfection in administrative proceedings is not required and courts should not vacate a judgment unless the substantial rights of a party have been affected."); *Austin v. Astrue*, No. 7:06-cv-622, 2007 WL 3070601, at *6 (W.D. Va. Oct. 18, 2007) ("Errors are harmless in Social Security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

## IV. Conclusion

A reviewing court must affirm the Commissioner's decision if it is supported by substantial evidence. Based on this record I find that substantial evidence exists. Accordingly, I **RECOMMEND** that this Court **DENY** Chestnut's Motion for Summary Judgment (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 17), and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

       Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

       Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

       The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

                      ENTER: May 5, 2014

                      Joel C. Hoppe
                      United States Magistrate Judge