IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| CARLA SUE CHESTNUT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:13-cv-00008 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

Before me is the Report and Recommendation ("R & R") of the United States Magistrate Judge recommending that I deny Plaintiff's Motion for Summary Judgment, grant the Commissioner's Motion for Summary Judgment, and dismiss this case from the active docket of the Court [ECF No. 22]. The R & R was filed on May 5, 2014, and Plaintiff Carla Sue Chestnut filed a timely Objection on May 19, 2014 [ECF No. 23]. The Commissioner offered no response within the subsequent fourteen (14) day period, and the matter is now ripe for review. *See* Fed. R. Civ. P. 72(b)(2). After careful review and consideration, and for the reasons stated below, I will **OVERRULE** Plaintiff's Objection, **ADOPT** the R & R of the Honorable Joel C. Hoppe, **DENY** Plaintiff's Motion for Summary Judgment [ECF No. 14], **GRANT** the Commissioner's Motion for Summary Judgment [ECF No. 17], and **DISMISS** this case from the active docket of the Court.

I. **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

On June 30, 2009, Plaintiff Carla Sue Chestnut ("Plaintiff") protectively filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act ("the Act"). (R. at 22, 212); *see* 42 U.S.C. §§ 401–434, 1381–1383f (2014). Plaintiff alleges that she has been disabled since

November 11, 2008, due to a combination of grand mal epileptic seizures, post-traumatic stress disorder/anxiety attacks, diabetes, and a back injury from a car accident in 2006. (R. at 212, 226.) At the time of her alleged onset date, Plaintiff was a 37-year-old college graduate with a certificate in business management. (R. at 52–53.)

Prior to that date, Plaintiff held a number of jobs that primarily involved the use of a telephone and computer.[1] (R. at 54–60, 227.) Although Plaintiff stopped working on November 11, 2008, she does not allege that it was the result of her impairments. (R. at 226–27.) Instead, Plaintiff indicates that she was laid off for other reasons and has been unable to find subsequent employment.[2] Plaintiff worked part-time as a telemarketer in 2009, but has not engaged in any substantial gainful activity since her alleged onset date. (R. at 24, 60–61.)

Plaintiff's claim was denied initially on January 26, 2010, and again, upon reconsideration, on August 3, 2010. (R. at 118–25, 131–34.) On June 22, 2011, Plaintiff, represented by counsel, appeared at a hearing before Administrative Law Judge ("ALJ") Robert D. Marcinkowski. (R. at 49–101, 136.) Plaintiff's friend, Holly Mackey, and a vocational expert ("VE"), Linda Ebersold, also testified at the hearing. (R. at 78–100.) In a decision dated July 22, 2011, the ALJ concluded that Plaintiff was not disabled under the Act. (R. at 22–40.)

---

[1] In her application, Plaintiff indicates that she held a number of jobs in 2008, including work as a benefits specialist at a call center, an appointment specialist at a call center, and an appointment specialist with a retail organization. (R. at 227, 268.) Since 1996, she has also worked as a receptionist, a directory assistance operator, a hotel telephone operator, a part-time laundry attendant, a customer service representative, a sales representative, a nursing center dietary aid, and attended missionary school. (R. at 56–60.) These jobs primarily involved computer, paperwork, and accounting skills, and generally required interaction with clients and customers via the telephone. (*Id.*)

[2] Plaintiff explains that "[b]ecause of other reasons (not my condition) I was working and [w]as [l]aid off and have not been able to find other employment . . . and I cannot get anyone to hire me now anyhow." (R. at 227.) Plaintiff alleges that she was told, by another employer, that her former employer is telling other potential employers that Plaintiff was released because of her epileptic seizures. (*Id.*)

The ALJ found that Plaintiff has the following severe impairments: insulin-dependent diabetes mellitus, post-traumatic stress disorder, an affective disorder, and obesity. (R. at 25–27.) None of these impairments, or combination of impairments, was found to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 27–29.) After consideration of the entire Record, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), subject to several additional limitations.[3] (R. at 29–36.) In addition, the ALJ found that Plaintiff "can understand, remember and carry out simple instructions and perform simple routine tasks." (R. at 29.) He determined that she could not, however, perform any of her past relevant work. (R. at 36–37.)

In light of Plaintiff's age, education, work experience, and RFC, and based on the testimony of the VE, the ALJ found that Plaintiff was capable of performing jobs that exist in significant numbers in the national economy.[4] (R. at 37–38.) Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (R. at 38.) On January 24, 2013, the Appeals Council denied Plaintiff's request for review, and the decision of the ALJ became the final decision of the Commissioner. (R. at 1–3.)

On February 27, 2013, Plaintiff filed suit in this Court to challenge the final decision of the Commissioner on the grounds that it is not supported by substantial evidence and is contrary to law and regulation. (Compl. [ECF No. 3].) Pursuant to 28 U.S.C. § 636(b)(1)(B), I referred

---

[3] The ALJ found that Plaintiff can "occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl but never climb ladders, ropes or scaffolds; and, should avoid exposure to hazards such as machinery and heights." (R. at 29.)

[4] For example, the VE testified that an individual with Plaintiff's limitations would be able to perform the requirements of the representative occupations of an addresser, with 26,609 such jobs in the national economy and 920 in Florida, and a call-out operator, with 19,073 such jobs in the national economy and 2,390 in Florida. (R. at 37–38.)

the case to United States Magistrate Judge Joel C. Hoppe for consideration.[5] (Order, Feb. 24, 2014 [ECF No. 19].) Plaintiff and the Commissioner filed cross-motions for summary judgment. (Pl.'s Mot. Summ. J., Sept. 23, 2013 [ECF No. 14]; Def.'s Mot. Summ. J., Oct. 28, 2013 [ECF No. 17].) On May 5, 2014, Judge Hoppe filed his Report and Recommendation, recommending that I affirm the final decision of the Commissioner. (R & R [ECF No. 22].) On May 19, 2014, Plaintiff filed a timely Objection to the R & R. (Pl.'s Obj., May 19, 2014 [ECF No. 23].) The Commissioner offered no response, and the matter is now ripe for review.

## II. STANDARD OF REVIEW

Congress has limited the judicial review I may exercise over decisions of the Social Security Commissioner. I am required to uphold the decision where: (1) the Commissioner's factual findings are supported by substantial evidence; and (2) the Commissioner applied the proper legal standard. *See* 42 U.S.C. § 405(g) (2014); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The Fourth Circuit has long defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In other words, the substantial evidence standard is satisfied by producing more than a scintilla but less than a preponderance of the evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and findings to determine the functional capacity of the claimant. 20 C.F.R. §§ 404.1527–404.1545 (2014); *see Shively v. Heckler*, 739 F.2d 987, 990 (4th Cir. 1984) (noting that it is the role of the ALJ, not the vocational expert, to determine disability). The Regulations

---

[5] This matter was initially referred to the Honorable B. Waugh Crigler, and then to the Honorable Robert S. Ballou, and finally to the Honorable Joel C. Hoppe.

grant the Commissioner latitude in resolving factual inconsistencies that may arise during the evaluation of the evidence. 20 C.F.R. §§ 404.1527, 416.927 (2014). Unless the decision lacks substantial evidence to support it, the ultimate determination of whether a claimant is disabled is for the ALJ and the Commissioner. *See id.* §§ 404.1527(e), 416.927(e); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the ALJ's resolution of the conflicts in the evidence is supported by substantial evidence, then I must affirm the Commissioner's final decision. *Laws*, 368 F.2d at 642. In reviewing the evidence, I must not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [my] judgment for that of the Secretary.[6]" *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589).

## III. DISCUSSION

Plaintiff objects to six elements of the R & R. (Pl.'s Obj. 1–6.) In essence, Plaintiff argues: (1) the ALJ failed to give proper weight to the opinion of Dr. Henry Comiter; (2) the ALJ improperly discounted the testimony of Plaintiff's friend, Ms. Holly Mackey; (3) the ALJ improperly discounted Plaintiff's credibility; (4) the ALJ's misreading of the opinion of Dr. Cheryl Laird was not harmless error; (5) the ALJ misrepresented the findings of Dr. Muir and Dr. Hinkeldey; and (6) the representative occupations cited by the VE are inconsistent with Plaintiff's RFC and the ALJ's hypothetical. I will address each of these objections in turn.

   *1. The Opinion of Dr. Henry Comiter*

On March 7, 2011, Plaintiff's neurologist, Dr. Henry Comiter, completed a "Seizures Medical Source Statement" form in which he opined on the nature and limiting effects of Plaintiff's seizure disorder. (R. at 942–45.) The ALJ considered Dr. Comiter's opinion in his assessment of Plaintiff's impairments, but ultimately assigned it "little weight because it is

---

[6] Or the secretary's designate, the ALJ. *See Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

inconsistent with the medical evidence . . . ." (R. at 27.) Plaintiff argues that the ALJ's reasons for doing so are insufficient and not supported by substantial evidence. (Pl.'s Obj. 1–3.) Specifically, Plaintiff contends that it was error to focus "on the issue of the number of seizures suffered by plaintiff instead of focusing on the entirety of Dr. Comiter's opinions . . . ." (*Id.* at 2.) Further, Plaintiff argues that medical evidence supports Dr. Comiter's assessment of her postictal symptoms and the side effects of her medication.[7]

The ALJ has a responsibility to weigh each medical opinion in the record. 20 C.F.R. §§ 404.1527(b), 416.927(b) (2014). If the opinion is that of a treating physician, it is assigned either "controlling weight," or something less than controlling weight. *Id.* §§ 404.1527(c), 416.927(c). After considering the record as a whole, if the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," then that opinion is entitled to controlling weight. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). On the other hand, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

While Plaintiff argues that the ALJ erred by focusing on the number of seizures, a significant discrepancy exists between Dr. Comiter's estimate that Plaintiff experiences an average of six seizures per year, and the approximately seven seizures over a period of about

---

[7] Plaintiff notes Dr. Comiter's opinion that the medications Topamax and Lamictal, while resulting in some decrease in the severity and frequency of her seizures, also produce side effects of dizziness, eye focusing problems, lethargy, double vision, coordination disturbance, and lack of alertness. (Pl.'s Obj. 2; R. at 944.) Dr. Comiter also opined that Plaintiff suffers from mental problems associated with her seizure disorder, including depression, irritability, social isolation, poor self-esteem, short attention span, memory problems, and behavior extremes. (Pl.'s Obj. 2–3; R. at 945.)

four-and-a-half years that appear in the Record. (R. at 27, 942; R & R 11–12.) I am sympathetic to the fact that not every seizure may be documented by a trip to the emergency room, but it is reasonable to expect that Plaintiff will report an accurate count to her health service providers. At the very least, this inconsistency between the medical evidence and Dr. Comiter's opinion supports the ALJ's decision to accord his opinion something less than controlling weight.

I am also not persuaded that the medical evidence is consistent with Dr. Comiter's assessment of Plaintiff's postictal symptoms and the side effects of her medication. In July 2010, Plaintiff visited the emergency room and reported experiencing a seizure after hitting her head on a water slide. (R. at 990.) Plaintiff complained that she had hit her head a week earlier, and had experienced intermittent headaches since the accident, finally resulting in a seizure on the date of her emergency room visit. (R. at 993.) The report from a physician's examination, performed contemporaneously to Plaintiff's seizure, observed that her mood and affect were normal, and that she was alert, oriented, and speaking coherently. (R. at 990–92, 996.) The physician reported that Plaintiff's condition was satisfactory, and discharged her with instructions to return immediately if she experienced persistent confusion. (R. at 996, 1000–01.) Plaintiff sought no further treatment until October 2010. (R & R 12; R. at 957.)

Further, the ALJ may properly discount the opinion of a treating physician when it is inconsistent with a claimant's daily activities. *See Dennison v. Astrue*, 5:10-cv-109, 2011 WL 2604847, at *2 (W.D. Va. July 1, 2011) (citing *Craig*, 76 F.3d at 590). In his discussion of Dr. Comiter's opinion, the ALJ found that Plaintiff "has been able to perform her activities of daily living independently," and "prepared and got physically ready to go to a mission trip overseas[.]" (R. at 27.) In particular, Plaintiff told a nurse in 2010 that she was walking two miles every day in order to prepare for her mission trip. (R. at 956.) Based on the testimony of Plaintiff and her

friend, Ms. Mackey, the ALJ also noted that Plaintiff lives alone, feeds, grooms, and dresses herself, cleans her apartment, cares for a cat, leaves her apartment several times per day, goes shopping with friends, and attends church every Sunday. (R. at 35.)

After reviewing the opinion of Dr. Comiter in its entirety, I find that substantial evidence supports the ALJ's finding that his opinion is inconsistent with medical evidence from the Record, as well as Plaintiff's daily activities during the relevant time period. At best, Plaintiff highlights conflicting evidence, which would be inappropriate for me to re-weigh in the context of substantial evidence review. *See Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). I am satisfied that the ALJ properly considered the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c), and I will overrule Plaintiff's Objection.

### 2. *The Testimony of Ms. Holly Mackey*

At Plaintiff's administrative hearing, her friend, Holly Mackey, testified on her behalf. (R. at 78–83.) Ms. Mackey testified that she had never witnessed Plaintiff experience a seizure, but had observed her following both a grand mal and a petit mal seizure. (R. at 79.) In relevant part, Ms. Mackey testified that after a grand mal seizure, Plaintiff's tongue is "swollen and bloody" from being bitten, she appears "totally confused" and has been unconscious, and has "usually fallen down" and hurt herself. (R. at 79–80.) After a petit mal seizure, Ms. Mackey testified that Plaintiff appears "very confused," "scared," and "upset," "doesn't remember where she was, [or] what happened while she was unaware," "always has a headache," and "her eyes hurt." (R. at 80.)

Plaintiff argues that the ALJ improperly discounted the testimony of Ms. Mackey, and contends that her testimony "speaks to the question of whether [P]laintiff's impairment imposes significant limitations on [P]laintiff's ability to perform basic work activities." (Pl.'s Obj. 2.)

Specifically, Plaintiff argues that "[l]osing consciousness or suffering from confusion and headaches that last for a few days to several weeks clearly imposes significant limitations upon [P]laintiff's ability to perform work activities." (*Id.*)

Ms. Mackey is an appropriate *non-medical* source of evidence regarding the severity of Plaintiff's impairments and how they affect her ability to work. *See* 20 C.F.R. §§ 404.1513(d)(4), 416.923(d)(4) (2014). She is not, however, an acceptable *medical* source, and as such, the opinion of Ms. Mackey is never entitled to controlling weight. *Id.* §§ 404.1513(a), 416.923(a), 404.1527(c), 416.927(c). After reviewing her testimony, I find that Ms. Mackey did not expressly speak to the issue of whether Plaintiff's symptoms limit her daily activities. (R. at 78–83.) On the other hand, I agree that her testimony is at least relevant to the question of whether Plaintiff's symptoms limit her ability to perform basic work activities.

It is clear from the Record, however, that the ALJ properly considered the testimony of Ms. Mackey in his evaluation of Plaintiff's claim for benefits. Although the ALJ did not specifically explain the role that Ms. Mackey's testimony played in his evaluation of Dr. Comiter's opinion,[8] he discussed her testimony at length in his analysis of Plaintiff's RFC. (R. at 27, 30–31); *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2014). In that context, Ms. Mackey's testimony was considered for precisely the reasons that Plaintiff argues it to be relevant. (R. at 29–36; Pl.'s Obj. 2.)

The ALJ acknowledged that "[i]t is reasonable to conclude that the claimant should have some pain and/or limitations as a result of her physical and mental impairment." (R. at 36.) Nevertheless, after weighing the evidence from the Record, and assessing the credibility of the testimony, the ALJ concluded that Plaintiff has the ability to perform work activities consistent

---

[8] The portion of the R & R to which Plaintiff objects is a discussion of Ms. Mackey's testimony in the context of the ALJ's decision to accord little weight to the opinion of Dr. Comiter. (Pl.'s Obj. 2; R & R 13–14.) While this closely relates to the discussion above, Plaintiff presents it as a separate objection.

with the stated limitations. (*Id.*) Mindful that I am not at liberty to re-weigh conflicting evidence or make credibility determinations reserved to the Commissioner, I find no error in the ALJ's consideration of the opinion of Ms. Mackey. Accordingly, I will overrule Plaintiff's Objection.

*3. The ALJ's Assessment of Plaintiff's Credibility*

The ALJ found Plaintiff's "testimony and subjective statements regarding her pain and limitations credible to the extent of establishing that she has severe impairments that are significantly limiting, but not fully credible to the extent of establishing that the impairments are so severe as to preclude her from performing substantial gainful activity . . . ." (R. at 35.) In particular, the ALJ concluded that Plaintiff's preparation for an overseas missionary trip and other daily activities "tend to suggest that her alleged symptoms and limitations may have been overstated." (*Id.*) Subjective complaints and statements of symptoms, like all other evidence of disability, are considered in the context of the Record as a whole. 20 C.F.R. §§ 404.1529, 416.929 (2014). If Plaintiff's statements are inconsistent with other evidence, the ALJ may find them less than fully credible and weight them accordingly. *See* SSR 96-4p, 1996 WL 374187 (July 2, 1996); SSR 96-7p, 1996 WL 374186 (July 2, 1996). Plaintiff argues that the ALJ's assessment of her credibility is not supported by substantial evidence because: (1) Plaintiff was never cleared to perform missionary work overseas by her physician; and (2) Plaintiff relies upon others to help her perform her activities of daily living. (Pl.'s Obj. 3, 5.)

First, Plaintiff correctly points out that she was never actually given clearance by her physician to perform overseas missionary work. When Plaintiff first sought medical clearance in January 2010, Nurse Janine Kyte wrote that she "would not sign a paper saying she is fit for mission work until her diabetes and seizures are in better control and she could be more

physically active." (R. at 860.) The form indicated that Plaintiff would need to walk 3–4 miles per day, "and at this time [she] has difficulty completing ambulation of [the] hallway." (*Id.*) Nurse Kyte characterized Plaintiff's insight and judgment as "questionable." (R. at 859.)

It was not merely that request, however, that led the ALJ to conclude that Plaintiff may have been overstating the severity of her symptoms. Instead, it was "[t]he fact that she continued to increase her physical activity in preparation for her trip . . . ." (R. at 35.) After her initial consultation regarding her mission trip, Plaintiff returned for a regular appointment on February 8, 2010. (R. at 844–50.) Although Nurse Kyte again characterized her insight and judgment as "questionable," she "congratulated [Plaintiff] on her increasing physical activity," and noted that she was "now walking a mile or more a day." (R. at 845, 848–49.)

On March 24, 2010, Plaintiff returned for a travel vaccine and denied experiencing any back pain, joint pain, or stiffness. (R. at 835.) Her judgment and insight were observed to be "intact [and] improved." (R. at 836.) By October 2010, Plaintiff was enrolled in missionary school, and Nurse Kyte remarked that she was "doing very well currently." (R. at 956.) Plaintiff reportedly was walking two miles per day, and her judgment and insight were "intact." (R. at 956, 958.) Plaintiff again denied experiencing any back pain, joint pain, or stiffness. (R. at 957.) Regardless of whether she obtained clearance from her physician, it seems clear that Plaintiff was successfully able to increase her physical activity in preparation for the trip.

Second, Plaintiff argues that the ALJ failed to acknowledge the testimony of her friend, Ms. Holly Mackey, in reaching his conclusion that Plaintiff's daily activities were inconsistent with her alleged impairments. (Pl.'s Obj. 5.) I find this argument to be unpersuasive. Plaintiff's own testimony supports the ALJ's finding that she is "able to live alone, dress independently, prepare her own meals, wash dishes, climb stairs to her second floor apartment, do laundry on

- 11 -

the first floor, and attend church every Sunday." (R. at 35, 52–53, 66, 72–73.) The ALJ relied on the adult function reports completed by both Plaintiff and Ms. Mackey, as well as a psychiatric review completed by Dr. Ronald Chase, to support his conclusion that Plaintiff is "able to go outside for walks, leave the apartment 1 to 2 times a day, read, paint, clean her apartment, walk to the store or bank, visit with neighbors, care for her cat, use public transportation, follow written instructions, and shop in stores for clothes, food and music." (R. at 35, 245–51, 254–64, 805–06.) Medical records, dated July 8, 2010, document a head injury that Plaintiff sustained while she was using a water slide. (R. at 990–93.)

While the testimony of Ms. Mackey underscores the limitations that the ALJ found in his hearing decision, it does nothing to refute the daily activities that the ALJ believed were inconsistent with Plaintiff's statements and complaints. (R. at 78–83.) Further, as discussed in the preceding section, the ALJ properly discounted the testimony of Ms. Mackey as inconsistent with the evidence. Plaintiff's longitudinal medical records, increased physical activity in preparation for her mission trip, and evidence of her daily activities constitute substantial evidence to support the ALJ's assessment of Plaintiff's credibility. Accordingly, I will overrule Plaintiff's Objection.

### 4. *The Opinion of Dr. Cheryl Laird*

One of the medical opinions given "great weight" by the ALJ was that of Dr. Cheryl Laird, Plaintiff's mental health counselor. (R. at 35, 716–17, 898–99.) The ALJ stated that Dr. Laird "noted in April 2010, that [Plaintiff] appeared to be able to deal with her issues." (R. at 35.) That statement is plainly incorrect. In April and May 2010, Dr. Laird wrote identical letters opining that Plaintiff "appeared to be able to deal with her issues" *when she left counseling* in

July 2008.⁹ (R. at 898–99.) Plaintiff argues that this misstatement of the relevant time period amounts to more than harmless error, and contends that the "ALJ's RFC did not properly accommodate the residual functional limitations stemming from [P]laintiff's mental impairments." (Pl.'s Obj. 3–4; R & R 18–19.)

An error in the administrative process is harmless where it clearly has no bearing on the procedure used or the substance of the ultimate decision.¹⁰ In this case, Dr. Laird noted that Plaintiff's memory had deteriorated since July 2008, she was experiencing frequent seizures, and she maintained detailed notes regarding her daily activities due to exaggerated memory loss. (R. at 898–99.) These limitations are consistent with other medical opinions and evidence of record, which the ALJ incorporated into his RFC assessment by finding that Plaintiff was limited to "unskilled" jobs that involve "simple instructions" and "simple routine tasks." (R. at 29, 38.)

After considering the letters of Dr. Laird, it is apparent that even though the ALJ misinterpreted the temporal context of her statement, he fully accommodated the limitations expressed by Dr. Laird in his assessment of Plaintiff's RFC. Further, Dr. Laird's opinion was only one of four medical opinions given great weight by the ALJ, and there is no reason to believe that a proper reading of Dr. Laird's opinion would have resulted in any further RFC

---

⁹ Dr. Laird also remarked that when Plaintiff returned to counseling in late 2009, "[h]er memory had deteriorated," "she was experiencing frequent seizures," and "[s]he maintained detailed notes re: therapy and her daily activities/appointments due to the exaggerated memory loss." (R. at 898–99.) It is not clear whether Dr. Laird is reporting her own observations or Plaintiff's subjective statements and complaints.

¹⁰ *See, e.g.*, *Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *Massachusetts Trs. of E. Gas & Fuel Associates v. United States*, 377 U.S. 235, 248 (1964)) ("While the general rule is that 'an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained,' reversal is not required when the alleged error 'clearly had no bearing on the procedure used or the substance of the decision reached.'"). *See also Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005) (applying *Ngarurih* to the denial of Social Security disability benefits).

limitations. (R. at 35–36.) Accordingly, I find that the ALJ's erroneous reading of Dr. Laird's opinion amounts to harmless error, and I will overrule Plaintiff's Objection.

### 5. *The Findings of Dr. Muir and Dr. Hinkeldey*

The ALJ gave "great weight" to the medical opinions of consultative psychological examiners Dr. Nancy Hinkeldey and Dr. Katherine Muir. (R. at 35–36, 692–96, 789–90.) In the words of the ALJ, Dr. Hinkeldey "evaluated the claimant in February 2008, found no actual deficits in learning and memory functions, and opined that while there were cognitive changes associated with [Plaintiff]'s seizures, they were not of a severity to preclude employment." (R. at 35.) The ALJ stated that Dr. Muir "saw [Plaintiff] on December 2009," "found her to be alert with activity levels within normal limits," and "found [that Plaintiff] exhibited average intellectual functioning, no agitation or psychomotor retardation, and no loosening of associations or other indications of a thought disorder." (R. at 36.) Plaintiff argues that the ALJ misrepresented the findings of Dr. Muir and Dr. Hinkeldey, and claims that Plaintiff's RFC does not accurately address her mental impairments as a result. (Pl.'s Obj. 4–5.)

In support of her argument, Plaintiff points to specific findings which she claims were ignored by the ALJ. (*Id.*) Dr. Muir noted that on the date of her examination, Plaintiff's "[a]ttention and concentration seem[ed] below average," "her mood appeared depressed," and her "[a]ffect was blunted and at times inappropriate to content." (R. at 790; Pl.'s Obj. 4.) Her diagnostic impression included major depressive disorder, generalized anxiety disorder, R/O panic disorder with agoraphobia, seizures, and diabetes. (*Id.*) Dr. Hinkeldey opined that Plaintiff's social functioning and functional ability appeared "marginal," noted symptoms of her anxiety and post-traumatic stress disorder, and found that Plaintiff's social skills "are affected by

anxiety to some degree." (R. at 696.) Plaintiff argues that the ALJ failed to adequately address the severity of these impairments in his assessment of Plaintiff's RFC. (Pl.'s Obj. 4–5.)

After considering the reports of Dr. Muir and Dr. Hinkeldey, however, I find no inconsistency between the evidence and the findings of the ALJ. According to Plaintiff, Dr. Muir's report "documents a woman with concentration and attention below average, a depressed mood, and a blunted affect." (*Id.* at 4.) The ALJ, in turn, acknowledged that Plaintiff suffers from the severe impairments of "post-traumatic stress disorder" and "an affective disorder." (R. at 25.) It is also worth noting that Dr. Hinkeldey's assessment was conducted on February 11, 2008, approximately 9 months prior to Plaintiff's alleged onset date.[11] (R. at 692.)

Although the opinions of Dr. Muir and Dr. Hinkeldey reflect limitations on Plaintiff's ability to engage in substantial gainful employment, I find no evidence of misrepresentation on the part of the ALJ. These reports assess Plaintiff's relative strengths and weaknesses, they were explicitly considered in the hearing decision, and their overall tenor is consistent with the ALJ's assessment of Plaintiff's RFC. Without more to her argument, Plaintiff is essentially asking this Court to improperly re-weigh the evidence. Accordingly, I find that the reports of Dr. Muir and Dr. Hinkeldey support the findings of the ALJ, and I will overrule Plaintiff's Objection.

      *6. Testimony of the VE and Plaintiff's Representative Occupations*

Finally, Plaintiff contends that the ALJ erred in relying on the VE's testimony without first obtaining a reasonable explanation for conflicts between his testimony and the Dictionary of

---

[11] The Record indicates that after Dr. Hinkeldey's assessment in February, Plaintiff was employed full-time as an appointment specialist at a call center (March 2008–June 2008), an appointment specialist at a retail organization (July 2008–August 2008), and a benefits specialist at a call center (September 2008–November 2008). (R. at 226–27, 268, 692.)

Occupational Titles ("DOT") published by the Department of Labor.[12] (Pl.'s Obj. 5–6.) Each job listed in the DOT is assigned a Reasoning Development ("RD") level that describes a "satisfactory" worker's ability to carry out instructions and cope with departures from "standardized situations." *See* Dep't of Labor, Office of Admin. Law Judges, *Dictionary of Occupational Titles* App. C, § III (4th ed. 1991), 1991 WL 688702. According to Plaintiff, "[t]he ALJ's hypothetical and ultimate residual functional capacity finding clearly corresponds to a reasoning level of 1 under the Dictionary of Occupational Titles." (*Id.*) The representative occupations cited by the ALJ—addresser (DOT No. 209.587-010) and call-out operator (DOT No. 237.367-014)—correspond to RD levels of 2 and 3, respectively. (R. at 38.)

RD levels range from 1 to 6, with an RD level of 1 indicating that a worker is able to "[a]pply commonsense understanding to carry out simple one- or two-step instructions," and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT App. C, § III. At RD level 2, a worker must "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* At RD level 3, a "satisfactory" worker must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and "[d]eal with problems involving several concrete variables in or from standardized situations." *Id.*

---

[12] Pursuant to 20 C.F.R. § 404.1566, the ALJ considers both the DOT and the testimony of the VE in determining whether an individual can find work suited to their RFC. Social Security Ruling 00-4p clarifies this regulation, and provides that "[w]hen there is an apparent unresolved conflict between [VE] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [VE] evidence to support a determination or decision about whether the claimant is disabled." Specifically, the ALJ "will inquire, on the record, as to whether or not there is such consistency." SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000); *see also Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) (per curiam).

The narrowest hypothetical posed by the ALJ asked the VE to consider an individual matching Plaintiff's age, education, and work experience who: (1) could perform sedentary work involving simple, routine tasks; (2) could understand, remember, and carry out simple instructions; (3) could only occasionally interact with people; and (4) should avoid exposure to hazards such as machinery and heights. (R. at 87–88.) The ALJ did not expressly limit his hypothetical or RFC finding to jobs with an RD level of 1, nor does Plaintiff offer any authority from which such a limitation might be implied. (R. at 29–36, 84–101; Pl.'s Obj. 5–6.) At the hearing, the VE testified that there were "no conflicts between the occupational evidence [she] provided and the information contained in the [DOT] . . . ." (R. at 88–89.) On cross-examination, the VE also testified that "simple instructions" are compatible with jobs corresponding to RD levels of 2 and 3. (R. at 94.)

There has been some disagreement among courts in the Fourth Circuit as to whether a person limited to work involving simple, repetitive, routine tasks can perform jobs with an RD level of 2.[13] In a number of these cases, including *Snider*, *Burnette*, and *Taylor*, the district courts followed the approach set forth in *Meissl v. Barnhart*, 403 F. Supp. 2d 981 (C.D. Ca. 2005), which reasoned:

---

[13] *Compare Snider v. Colvin*, No. 7:12cv539, 2014 WL 793151, at *7–8 (W.D. Va. Feb. 26, 2014) (unskilled work involving simple instructions is "proportionate to DOT reasoning level two"); *Taylor v. Astrue*, No. 5:10–cv–263–FL, 2011 WL 1599679, at *13 (E.D.N.C. Mar. 23, 2011) (finding that "a limitation to simple, routine and repetitive tasks is not inconsistent with jobs at the DOT reasoning development level 2"); *Dillon v. Astrue*, No. TMD 08–2597TMD, 2011 WL 337334, at *5 (D. Md. Jan. 31, 2011) (finding that work requiring an RD level of 2 is not inconsistent with a limitation to simple, routine tasks); *Pippen v. Astrue*, No. 1:09cv308, 2010 WL 3656002, at *7 (W.D.N.C. Aug. 24, 2010) ("work requiring a reasoning level of two are not inconsistent with a limitation to simple work"); *Burnette v. Astrue*, No. 2:08-cv-009-FL, 2009 WL 863372, at *17 (E.D.N.C. Mar. 24, 2009) ("the RFC to perform simple, routine and repetitive tasks is consistent with a reasoning level of 2"), *with Jernigan v. Astrue*, No. 7:07-cv-201-BO, 2008 WL 4772202, at *3 (E.D.N.C. Oct. 28, 2008) ("'simple, routine, repetitive job tasks' are a reasoning level 1"); *Tadlock v. Astrue*, No. 8:06-3610-RBH, 2008 WL 628591, at *9–10 (D.S.C. Mar. 4, 2008) ("there appears to be a conflict between [unskilled, simple, routine, repetitive work] and [an RD level of 2]").

> The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking . . . apprehend the most abstruse classes of concepts" at level six). DOT at 1010–1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity. Even more problematic for [claimant's] position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

*Meissl*, 403 F. Supp. 2d at 984. The *Meissl* Court concluded that a limitation to "simple, routine, repetitive tasks" was consistent with jobs at the DOT reasoning level of 2. *Id.* at 985–85.

I find the approach of the *Meissl* Court to be well-supported and logically persuasive. The clear weight of authority from other district and circuit courts appears to support the conclusion that an RFC to perform simple, routine tasks is consistent with an RD level of 2.[14] Accordingly, I see no inconsistency between the VE's testimony regarding the representative

---

[14] The decisions of at least three circuit courts support this conclusion. *Lara v. Astrue*, 305 F. App'x 324, 326 (9th Cir. 2008) ("[S]omeone able to perform simple, repetitive tasks is capable of doing work requiring more rigor and sophistication—in other words, Reasoning Level 2 jobs."); *Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008) ("In *Hackett v. Barnhart*, we held that a limitation 'for simple and routine work tasks' was inconsistent with the demands of level-three reasoning but consistent with the demands of level-two reasoning, 395 F.3d 1168, 1176 (10th Cir. 2005)[.]"); *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive.") One circuit court has gone even further. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (RFC for simple work not inconsistent with an RD level of 3). *See also Pepin v. Astrue*, No. 09–464–P–S, 2010 WL 3361841, at *4–5 (D. Me. Aug. 24, 2010) (collecting cases

occupation of addresser, the DOT, and the ALJ's hypothetical and RFC findings. While it is less clear whether Plaintiff could transition to a job with an RD level of 3, such as a call-out operator, any reliance on that testimony amounts to harmless error.[15] The VE properly identified a position, existing in significant numbers, which has requirements that Plaintiff is able to perform.[16] As this constitutes substantial evidence to support the findings of the ALJ, I will overrule Plaintiff's Objection.[17]

IV. **CONCLUSION**

For the foregoing reasons, I find that substantial evidence supports the final decision of the Commissioner of Social Security. I have reviewed the remainder of the Record for clear error and, finding none, I will **OVERRULE** Plaintiff's Objection, **ADOPT** the R & R of the Honorable Joel C. Hoppe, **DENY** Plaintiff's Motion for Summary Judgment, **GRANT** the Commissioner's Motion for Summary Judgment, and **DISMISS** this case from the active docket of the Court.

---

from other district courts holding that an RD level of 2 is consistent with an RFC to perform simple, routine tasks); *Charles v. Astrue*, No. 07–1172, 2008 WL 4003651, at *4 (W.D. La. Aug. 7, 2008) (same).

[15] *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error"); *Taylor v. Astrue*, No. 5:10–cv–263–FL, 2011 WL 1599679, at *13 (E.D.N.C. Mar. 23, 2011) (finding harmless error where only one of the two positions identified by the VE had an RD level that was consistent with the claimant's RFC).

[16] *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) ("We do not think that the approximately 110 jobs testified to by the vocational expert constitute an insignificant number."). The VE testified that there are 26,609 jobs as an addresser in the national economy, and 920 such jobs in Florida. (R. at 38, 88.)

[17] I note the Government's failure to respond to Plaintiff's Objection with some chagrin. In particular, the alleged inconsistency between the VE's testimony and the DOT presents a specific, complex, and current issue of great import. By failing to research and marshal the relevant authorities, the Government forces this Court to expend scarce judicial resources and perform research that the Government failed to do. Both parties to a dispute must participate fully if the adversarial system is to function properly.

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record as well as to Magistrate Judge Hoppe.

ENTERED this 30th day of June, 2014.

                                              s/Jackson L. Kiser
                                              SENIOR UNITED STATES DISTRICT JUDGE